UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

KINGVISION PAY-PER-VIEW, LTD.,

                       Plaintiff,

-against-

MANUEL PALAGUACHI, et al.,

                       Defendants.
-------------------------------------------------------X

**REPORT AND RECOMMENDATION**

05 CV 3034 (CPS)

On June 23, 2005, plaintiff Kingvision Pay-Per-View, Ltd. (hereinafter "Kingvision") commenced suit against defendant Manuel Palaguachi, individually and as officer, director, shareholder and/or principal of El Piccolino Restaurante Corp., d/b/a El Piccolino Restaurante a/k/a El Piccolino Restaurante, and El Piccolino Restaurante Corp., d/b/a El Piccolino Restaurante, a/k/a El Piccolino Rest. (collectively "El Piccolino"), alleging that they had engaged in the illegal theft of a closed-circuit telecast of the October 2, 2004 boxing match between Felix Trinidad and Ricardo Mayorga, in violation of 47 U.S.C. §§ 553(a) and 605. Following the entry of a default judgment against defendants, the matter was referred to the undersigned to conduct an inquest and to report and recommend the amount of damages to be awarded.

For the foregoing reasons, this Court respectfully recommends that, pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i)(II), 605(e)(3)(C)(ii), and 605(e)(3)(B)(iii), plaintiff be awarded $11,000 in statutory damages and $2,187.50 in attorneys' fees and costs from the defendants, for a total of $13,187.50. The Court further recommends that plaintiff's request for an Order permanently enjoining defendants from violating 47 U.S.C. §§ 553(a) and 605 be denied.

## FACTUAL BACKGROUND

Plaintiff Kingvision entered into a closed-circuit television licensing agreement (the "Agreement"), in which plaintiff was granted the commercial rights to televise and distribute the October 2, 2004 Trinidad/Mayorga championship boxing match via encrypted satellite signal and closed circuit television to commercial establishments such as bars, restaurants, theaters, and arenas throughout New York. (Compl. ¶ 12; Westrich Aff. ¶ 3; Pl's. Mem. at 2).[1] In addition, the Agreement gave plaintiff the exclusive right to exhibit all undercard or preliminary bouts prior to the match (collectively, the "Event") at these closed circuit television locations. (Compl. ¶ 12). These closed-circuit locations could only obtain access to the broadcast by entering into a contractual relationship with plaintiff, which required each establishment to pay a sublicense fee to Kingvision. (Id. ¶¶ 13-14; Westrich Aff. ¶ 3).

In order to receive access to the interstate satellite transmission of the Event, each participating establishment was provided with electronic decoding equipment necessary to receive the electronically coded or scrambled signal. (Pl's. Mem. at 2).

Plaintiff alleges that defendant El Piccolino is a commercial establishment, located at 511 140th Street, Brooklyn, New York,[2] with a capacity of twelve persons. (Compl. ¶ 7; Westrich Aff. ¶ 7; Pl's. Mem. at 3). Plaintiff further alleges that El Piccolino did not enter into a contract with Kingvision to receive transmission of the Event. (Westrich Aff. ¶ 6). On the night of the

---

[1] Citations to "Compl." refer to the Complaint filed in this action on June 23, 2005; citations to "Pl's. Mem." refer to the Plaintiff's Memorandum of Law, dated October 31, 2005; and citations to "Westrich Aff." refer to the affidavit of Donna K. Westrich, Vice President of Kingsvision, dated September 21, 2005.

[2] While plaintiff's Memorandum of Law states the address of El Piccolino Restaurant as 511 140th Street, Brooklyn, NY, the Complaint, Westrich Affidavit, and Affidavit of Service represent the address to be 511 40th Street, Brooklyn, NY.

event, October 2, 2004, an auditor for plaintiff was present at El Piccolino at approximately 10:09 p.m., when he observed the Event being intercepted, received, and then televised to patrons of the defendant, without prior authorization. (Westrich Aff. ¶¶ 4-7, Ex. D; Pl's. Mem. at 3). According to the auditor's Affidavit, he observed fourteen patrons in El Piccolino while the Event was being displayed on a large screen television set in the premises. (Id.)[3] The restaurant was not collecting a cover charge. (Id.)

Plaintiff further alleges that defendant El Piccolino has since exhibited another Kingvision event, the May 14, 2005 Wright/Trinidad event, without authorization. (Westrich Aff. ¶ 10; Pl's. Mem. at 3, Ex. B). On May 14, 2005, the auditor who was present on the premises observed defendants broadcasting the Kingsvision event on three television sets to approximately fifteen patrons. (Id.; Westrich Aff. ¶ 10). The restaurant was not collecting a cover charge. (Pl's. Mem. at 3).

This action was commenced on June 23, 2005 and plaintiff served El Piccolino and Manuel Palaguachi on July 6, 2005, by personally delivering copies of the Summons and Complaint to each of them. (See Affidavits of Service of Kevin McIntosh, dated July 8, 2005). When defendants failed to answer or otherwise respond to the Complaint, plaintiff moved for entry of default. The Clerk of Court then entered a default on November 21, 2005. Following entry of default, the district court referred the issue of damages to the undersigned to conduct an inquest, and issue a Report and Recommendation as to damages.

---

[3]The Court notes that on both October 2, 2004 and May 14, 2005, plaintiff alleges that the events were viewed by a greater number of patrons than the occupancy of the restaurant would allow. (See Pl's. Mem. at 2-3 (estimating fourteen patrons present on October 2, 2004 and "approximately 15 people [present on May 14, 2005] in an establishment with the capacity of 12")).

3

## DISCUSSION

A. <u>Default</u>

Rule 55 sets forth a two-step process in which first a default, and then a default judgment, is entered. See <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 95 (2d Cir. 1993). The court clerk automatically enters the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by noting the party's default on the clerk's record of the case. See <u>id.</u>; Fed. R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default").

After a default has been entered against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), a default judgment may be entered. See Fed. R. Civ. P. 55(b). If the amount of damages must be ascertained in order for default judgment to be entered, the court may conduct a hearing. See Fed. R. Civ. P. 55(b)(2); <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d at 95. Here, plaintiff submitted a request for entry of default dated October 31, 2005. The Clerk of the Court entered a default on November 21, 2005.

In determining whether a default judgment should enter, courts have cautioned that a default judgment is an extreme remedy that should only be granted as a last resort. See <u>Meehan v. Snow</u>, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance the interest in expediting cases with the court's responsibility to "[afford] litigants a reasonable chance to be heard." <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d at 95-96. Thus, in light of the "oft-stated

4

preference for resolving disputes on the merits," defaults are "generally disfavored," and doubts should be resolved in favor of the defaulting party. Id. at 95-96. Accordingly, the plaintiff is not entitled to a default judgment as a matter of right, simply because the defendants are in default. See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (stating that courts are required to "supervise default judgments with extreme care to avoid miscarriages of justice," and ordering an inquest to determine damages).

The court possesses significant discretion and may consider a number of factors in deciding whether or not to grant a default judgment, including whether the grounds for default are clearly established and what amount of money is potentially involved. See Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *1-2 (S.D.N.Y. Oct. 19, 1992). The greater the amount of money involved, the less justification there may be for entering the default judgment. See id. Additionally, a court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure, §§ 2685, 2688 (3d ed. 1998).

When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993); see also Montcalm Publ'g Corp. v. Ryan, 807 F. Supp. 975, 977 (S.D.N.Y. 1992) (citing, *inter alia*, Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); 6 James Wm.

Moore et al., Moore's Federal Practice ¶ 55.03[2] (2d ed. 1988)). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Plaintiff alleges that the defendants violated 47 U.S.C. §§ 553(a)(1)[4] and 605(a) through the unauthorized reception of plaintiff's satellite communications. However, a court is not permitted to grant damages under both statutes for a single illegal transmission. See International Cablevision, Inc. v. Sykes, 75 F.3d 123, 129 (2d Cir.), cert. denied, 519 U.S. 929 (1996). Rather, the Second Circuit has stated that where a defendant is found to have violated both statutes, the court should award damages pursuant to Section 605. Id.; see also Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. 107, 110 (E.D.N.Y. 1997).

Here, it is clear that the allegations in the Complaint establish the elements of liability necessary to state a claim under Section 605. Section 605(a), which provides, *inter alia,* that "[n]o person not being authorized by the sender shall intercept any radio communications and divulge or publish the ... contents ... of such intercepted communication to any person," 47 U.S.C. § 605(a), has been held to apply to the interception of cable communications originating as a satellite or radio transmission. See International Cablevision, Inc. v. Sykes, 75 F.3d at 126. See also Entertainment by J&J, Inc. v. Mama Zee Rest. & Catering Servs., Inc., No. 01 CV 3945, 2002 WL 2022522, at *2 (E.D.N.Y. May 21, 2002); Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. at 110-11. Here, defendants' alleged conduct – the unauthorized interception, receipt, and broadcast of the Event derived from satellite

---

[4]Section 553(a)(1) provides, in pertinent part: "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1).

communications – violates this statute.

B. Damages

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish its entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 161-62; United States v. Crichlow, No. 02 CV 6774, 2004 WL 1157406, at *4 (E.D.N.Y. Apr. 9, 2004). While "the court must ensure that there is a basis for the damages specified in the default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (gathering cases), aff'd, 873 F.2d 38 (2d Cir. 1989).

In the instant case, plaintiff has submitted, *inter alia,* an inquest memorandum, affidavits from the auditor, and from plaintiff's Vice President, Donna K. Westrich. Where, as here, the plaintiff has filed reasonably detailed affidavits and exhibits pertaining to the damages incurred and where the defendant has failed to make an appearance in the case, or respond and present evidence on the issue of damages, the Court can make an informed recommendation regarding damages without an evidentiary hearing.

1. Statutory Damages

Where, as here, a violation of Section 605 has occurred, plaintiff is entitled to elect statutory damages. Section 605 provides for penalties "for each violation of subsection (a) of this section . . . in a sum of not less than $1,000 or more than $10,000, as the court considers just.

. . ." 47 U.S.C. § 605(e)(3)(C)(i)(II) (emphasis added). Although Section 605 requires the court to assess damages based on each "violation" of the statute, there is no statutory definition of "violation." Moreover, in cases such as this, involving the theft of services by a commercial establishment, it is often difficult to assess a precise figure.

In determining the amount of damages that can be imposed for each violation within the range of $1,000.00 to $10,000.00 per violation, Section 605 leaves the decision within the sound discretion of the court. See id.; see also Time Warner Cable of New York City v. Olmo, 977 F. Supp. 585, 589 (E.D.N.Y. 1997); Home Box Office v. Champs of New Haven, Inc., 837 F. Supp. 480 (D. Conn. 1993) (reducing total maximum statutory damage award of $250,000.00 to $10,000.00 for commercial broadcast of satellite cable programming). The factors to be considered in determining the appropriate amount of damages include the pecuniary loss sustained by the victim, any unlawful monetary gains by the defendant, and whether there have been repeat violations over an extended period of time. See Home Box Office v. Champs of New Haven, Inc., 837 F. Supp. at 484.

In calculating lost profits, some courts have awarded a flat damage amount when considering the unauthorized receipt and televised broadcast of a cable program by a commercial establishment. See, e.g., Top Rank, Inc. v. Ortiz, No. 01 CV 8427, 2003 WL 1960211, at *4 (S.D.N.Y. Mar. 27, 2003); Kingvision Pay-Per-View Ltd. v. Rodriguez, No. 02 CV 7972, 2003 WL 548891, at *2 (S.D.N.Y. Feb. 25, 2003); Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp., No. 88 CV 2834, 1991 WL 58350, at *2 (E.D.N.Y. Mar. 20, 1991); Home Box Office v. Champs of New Haven, Inc., 837 F. Supp. at 484. Others have assessed damages based on the number of patrons in the commercial establishment during the broadcast. See, e.g.,

8

Garden City Boxing Club, Inc. v. Rosado, No. 05 CV 1037, 2005 WL 3018704, at *4 (E.D.N.Y. Oct. 6, 2005); Top Rank Inc. v. Tacos Mexicanos, No. 01 CV 5977, 2003 WL 21143072, at *5 (E.D.N.Y. Mar. 28, 2003) (awarding $50.00 per patron); Entertainment by J&J, Inc. v. Mama Zee Rest. & Catering Servs., Inc., 2002 WL 2022522, at *4 (same); Time Warner Cable of New York City v. Googies Luncheonette, Inc. ("Googies"), 77 F. Supp. 2d 485, 489-90 (S.D.N.Y. 1999) (same); Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. at 111 (same); Kingvision Pay-Per-View Corp. v. Prime Time Saloon, Inc., No. 95 CV 1422, Report and Recommendation of Levy, M.J. (E.D.N.Y. Sept. 30, 1996) (awarding $50.00 per patron plus a $10.00 per patron cover charge), adopted by Order of the Honorable David G. Trager (E.D.N.Y. October 21, 1996); Cablevision Sys. Corp. v. 45 Midland Enters., Inc., 858 F. Supp. 42, 45 (S.D.N.Y. 1994) (awarding $50.00 per patron).

Plaintiff asserts that there are a number of components to the pecuniary loss suffered here, including lost sublicense fees, lost admission charges, and loss of good will. (Pl's. Mem. at 2-3). Here, plaintiff not only lost the sublicense fee that it would have been entitled to had the defendant entered into an authorized agreement to broadcast the Event, but given that there were at least fourteen patrons present during the unauthorized broadcast, plaintiff also lost the admission fees normally charged by Kingvision from the individual patrons.[5]

In addition, plaintiff argues that this theft of its services deprives plaintiff of its good will, reputation, and business investment and, as a result, has caused and continues to cause plaintiff to

---

[5] Although plaintiff has not provided any evidence as to the price it charged commercial establishments to broadcast the Event, the Court concludes that a fifty dollar per patron charge is appropriate. See Googies, 77 F. Supp. 2d at 490 (stating that to the extent the $50.00 per patron sum reflects a "greater amount than plaintiff would have legitimately obtained in that not every patron would have ordered the match individually, whatever extra it represents can be seen to encompass the defendants' profits on the sale of food and drink").

lose as customers those establishments who cannot attract paying patrons when the Event is televised in establishments that charge no fee or charge a fee that is considerably less than the fees demanded by plaintiff. Plaintiff also argues that this type of theft has an impact not only on the goodwill of plaintiff, but also on the entertainment and movie industries in general. (Id. at 2-3). Accordingly, plaintiff argues that all of these factors should be considered by the court in fixing damages at the maximum statutory amount of $10,000.00. (Id. at 5).

2. Enhanced Damages

Plaintiff also seeks enhanced statutory damages pursuant to Section 605(e)(3)(C)(ii), which provides for additional awards of up to a maximum of $100,000.00 for all willful violations. (Id.) The statute permits enhanced damages where the violation was committed willfully and for purposes of private financial gain. See Entertainment by J&J, Inc. v. Ramsarran, No. 01 CV 5223, 2002 WL 720480, at *2 (E.D.N.Y. Mar. 11, 2002) (awarding statutory damages of $5,000.00, increased by $10,000.00 for willfulness under 47 U.S.C. § 605(e)(3)(C)(ii), where defendant displayed a boxing match to eighteen patrons in his bar); Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. at 111-12 (E.D.N.Y. 1997) (awarding statutory damages of $3,750, increased by $5,000 for wilfulness under section 605(e)(3)(C)(ii), where defendant displayed a boxing match to seventy-five people inside and twenty people outside his restaurant); Joe Hand Promotions v. Burg's Lounge, 955 F. Supp. 42, 44 (E.D. Pa. 1997) (awarding $1,000.00 in statutory damages under § 605(e)(3)(C)(i)(II), plus an additional $1,000.00 based on the willful nature of the violation under § 605(e)(3)(C)(ii) where defendants were found to have broadcast a boxing event in their taverns). This section clearly

applies to persons or entities which operate commercial establishments such as bars, taverns, and restaurants that exhibit unauthorized programming to its patrons. See, e.g., Time Warner Cable of New York City v. Taco Rapido Rest., 988 F. Supp. at 112.

Willful behavior under the statute has been interpreted to include "'disregard for the governing statute and an indifference to its requirements.'" ON/TV of Chicago v. Julien, 763 F.2d 839, 844 (7th Cir. 1985) (quoting Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 127 (1985)); J&J Sports Prods., Inc. v. Louisias, No. 06 CV 339 (ERK), 2006 WL 1662608, at *4 (E.D.N.Y. May 16, 2006) (applying standard set forth in Trans World Airlines, Inc. v. Thurston). Courts may draw an inference of willfulness from a defendant's failure to appear and defend an action in which the plaintiff demands increased statutory damages based on allegations of willful conduct. See Fallaci v. New Gazette Literary Corp., 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983).

Here, it is clear that defendants intercepted and televised the Event without entering into a licensing agreement with plaintiff or paying fees to plaintiff. (See Westrich Aff. ¶ 6). To do so, defendants must have utilized an authorized decoder, illegally transferred an authorized decoder to the location, or illegally altered cable service to bring the signal to the restaurant. According to plaintiff's uncontradicted submissions, the Event could not have been mistakenly or innocently intercepted. (Id. ¶ 11). See Googies, 77 F. Supp. 2d at 490 (stating that "[s]ignals do not descramble spontaneously, nor do television sets connect themselves to cable distributions systems"). The defendants then televised the Event to patrons who were not required to pay the admittance fee customarily charged by plaintiff under its sublicense agreement, but who purchased meals or drinks from defendants while viewing the Event. Indeed, it is evident that El Piccolino was able to draw patrons into its establishment by offering them the ability to view,

11

without charge, a boxing match that would otherwise cost an individual viewer approximately fifty dollars. Thus, El Piccolino's exhibition of the Event very likely led to an increase in patrons and profits from food and drinks sold. See id. at 490-91. Thus, the evidence indicates that defendants acted willfully in illegally intercepting the Event, and they did so for private financial gain.

If statutory damages were assessed at the rate of $50.00 per patron as some courts have done, this would result in an award of only $700.00 in lost revenue based on the 14 patrons present at the Event, which is similar to the damages often imposed against individuals who have received unauthorized programming in their own homes. See, e.g., Time Warner Cable of New York City v. Baker, No. 96 CV 903, Report and Recommendation of Gold, M.J. (E.D.N.Y. Apr. 13, 1998) (assessing $1,500.00 against each of three defaulting defendants, pursuant to Section 605, where defendants used a single converter in their homes for a relatively short period of time and where there was no evidence that defendants were wealthy, recidivists, or sellers of converters), adopted by Order of the Honorable Frederic Block (E.D.N.Y. May 19, 1998); Time Warner Cable v. Jones, No. 96 CV 4367, Report and Recommendation of Gold, M.J. (E.D.N.Y. Mar. 26, 1998) (awarding to plaintiff $2,000.00 for each of several defaulting defendants where the evidence with respect to pecuniary loss was either limited or speculative), adopted by Order of the Honorable Charles P. Sifton (E.D.N.Y. May 22, 1998).

This Court finds that this amount understates the seriousness of defendants' conduct here, particularly since, as plaintiff contends, it has suffered intangible losses in the form of "business investment, business opportunities . . . and goodwill." American Television & Commc'ns Corp. v. Floken, Ltd., 629 F. Supp. 1462, 1466 (M.D. Fla. 1986). Moreover, if damages were imposed

solely under Section 605(e)(3)(C)(i)(II), that would not prove to be a sufficient award of damages since a simple disgorgement of profits lacks the incentive necessary to deter in the future the type of conduct engaged in by El Piccolino. Specifically, legitimate commercial establishments may be unwilling and unable to compete financially with establishments such as defendants' who offer the stolen programming to their customers for no fee or a reduced fee. Defendants' acts similarly damage plaintiff's goodwill and ability to control and negotiate for the rights to transmit the Event.

The evidence demonstrates that defendants acted willfully in illegally intercepting the Event under circumstances that warrant imposition of enhanced damages under Section 605(e)(3)(C)(ii). See Cablevision Sys. New York City Corp. v. Flores, No. 00 CV 5935, 2001 WL 761085, at *4 (S.D.N.Y. July 6, 2001) (awarding $10,000.00 in enhanced damages based on the need for deterrence, defendant's willful conduct, and the defendant's failure to appear); Entertainment by J&J, Inc. v. Ramsarran, 2002 WL 720480, at *2 (awarding $10,000.00 in enhanced damages for willfulness under 47 U.S.C. § 605(e)(3)(C)(ii), where defendant displayed a boxing match to eighteen patrons in his bar). Moreover, it appears that this is not the only occasion on which the defendants have illegally intercepted and broadcast a Kingvision event without prior authorization. (See Westrich Aff. ¶ 10; Pl's. Mem. at 3, Ex. B).[6] Accordingly, it is respectfully recommended that plaintiff be awarded statutory damages of $1,000.00, plus an additional $10,000.00 in enhanced damages, for a total of $11,000.00.

---

[6] As discussed above, an auditor for Kingvision observed the May 14, 2005 Wright/Trinidad event being displayed in El Piccolino without prior authorization. (Westrich Aff. ¶ 10). While this Court has determined that the display of the subsequent May 14, 2005 event does not warrant issuance of a permanent injunction (see discussion infra at 14-16), this second violation is a factor in recommending enhanced damages in this case.

13

3. <u>Injunctive Relief</u>

Under 47 U.S.C. § 605(e)(3)(B)(i), a court "may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of [§ 605(a)]." A court "'may . . . issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute, and (2) it meets the prerequisites for the issuance of an injunction.'" Kingvision Pay-Per-View Ltd. v. Autar, 426 F. Supp. 2d 59, 65 (E.D.N.Y. 2006) (internal quotation omitted). To warrant injunctive relief, plaintiff must show, *inter alia*, the absence of an adequate remedy at law. See Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57 (1975).

Courts have held that where there is no suggestion that a small commercial establishment is likely to repeat its conduct, "or that the remedies available under § 605 will not be adequate to deal with any further transgressions . . .[, i]t is difficult to fathom what this Court's injunction could add to the deterrence offered by § 605" and the "hefty price" it places upon violations. Kingvision Pay-Per-View Ltd. v. Autar, 426 F. Supp. 2d at 65; see also Kingvision Pay-Per-View Ltd. v. Lalaleo, No. 05 CV 2659, 2006 WL 1071885, at *8 (E.D.N.Y. Apr. 24, 2006) (denying injunctive relief in the absence of any evidence "that plaintiff will suffer irreparable harm or that the statutory and enhanced damages are insufficient to deter future conduct").

An injunction may be warranted where a large-capacity commercial defendant repeatedly disregards the statute, such that its profits weigh significantly against the statutory penalties. See, e.g., Kingvision Pay-Per-View, Ltd. v. Batista, No. 05 CV 614, 2005 WL 2999427, at *5 (E.D.N.Y. Oct. 6, 2005) (granting permanent injunction upon defendants' fourth "egregious" violation, where each illegal broadcast was to more than 120 patrons in commercial

establishment with maximum occupancy of 250, and where defendants "are undeniably deriving increased revenue by continuing to show these pirated boxing events in their establishment"); but see Top Rank, Inc. v. Allerton Lounge, Inc., No. 96 CV 7864, 1998 U.S. Dist. LEXIS 2394, at *18 (S.D.N.Y. Mar. 3, 1998) (enjoining defendants without records of prior violations and serving 75 or fewer patrons from future unauthorized broadcasting), adopted with modifications, 1998 U.S. Dist. LEXIS 22671 (S.D.N.Y. Mar. 24, 1998); Cablevision Sys. Corp. v. Maxie's N. Shore Deli Corp., No. 88 CV 2834, 1991 WL 58350, at *2 (E.D.N.Y. Mar. 20, 1991) (granting injunction against defendant without noting any prior violations and without determining actual number of patrons in sports bar, below uncredited estimate of 500).

In support of its request for injunctive relief, plaintiff miscites Time Warner Cable of New York City v. Googies Luncheonette, Inc., 77 F. Supp. 2d 485, as a case in which "an injunction was granted without comment." (Pl's. Mem. at 12). On the contrary, while noting the authority and prior practice of the court to enter injunctions under 47 U.S.C. § 605, Googies, 77 F. Supp. 2d at 489, the court declined to enter an injunction against any of the three defendants in the action. The court noted that two of the defendants, serving twenty and sixty patrons during the illegal broadcasts, had no prior violations. Id. at 488, 491. Even a third defendant who had one prior copyright violation, and was serving twenty patrons during the illegal broadcast, was not enjoined from future violations. Id. at 488, 491.

Here, defendant has allegedly broadcast a second Kingvision boxing event on May 14, 2005 to approximately fifteen people, without a cover charge. See Kingvision Pay-Per-View Ltd. v. Palaguachi, No. 06 CV 2509 (FB); (see also Pl's. Mem. at 3). Nevertheless, the Court finds that in light of El Piccolino's small, twelve-person capacity and the absence of any cover

charge, plaintiff has not established that the enhanced damages available under Section 605 damages are inadequate to address plaintiff's damages or that it would suffer irreparable harm absent injunctive relief. See Kingvision Pay-Per-View Ltd. v. Autar, 426 F. Supp. 2d at 65; see also Kingvision Pay-Per-View Ltd. v. Lalaleo, 2006 WL 1071885, at *8; cf. Googies, 77 F. Supp. 2d at 488, 491. Accordingly, the Court respectfully recommends that plaintiff's request for a permanent injunction be denied.

### 4. Attorneys' Fees and Costs

Pursuant to Section 605(e)(3)(B)(iii), plaintiff is also entitled to an award of reasonable attorneys' fees and costs. See 47 U.S.C. § 605(e)(3)(B)(iii). Plaintiff's counsel seeks a total of $1,387.50 in attorneys' fees and $800.00 in costs from the defendants. (Lonstein Aff. ¶¶ 3, 4).[7] In support of that request, plaintiff has submitted an affidavit setting forth a description of the legal services performed, the amount of time spent performing each of the services, the date on which the services were performed, and the position of the person performing the services. See N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). According to plaintiff's records, an attorney, billing at the rate of $200.00 per hour, expended six hours of time on the matter for a total of $1,200.00. A paralegal, billing at the rate of $75.00 per hour, expended two and one-half hours of time for a total of $187.50.[8] Based on a description of

---

[7] Citations to "Lonstein Aff." refer to the Affidavit of Julie Cohen Lonstein, Esq. in support of request for costs and fees, dated October 31, 2005.

[8] While the Affidavit of plaintiff's counsel states that a total of two hours was spent by the paralegal (id. ¶ 4), the total amount of time set forth in the time contemporaneous records is two and one-half hours, which, when charged at a rate of $75.00 per hour, is consistent with the requested amount of $187.50.

16

the services performed, the Court finds plaintiff's request for fees to be reasonable and appropriate under the circumstances and further determines that the rates charged are within or lower than the rates awarded to attorneys engaged in this type of practice in the Eastern District of New York.

In addition, plaintiff seeks reimbursement for filing fees of $250.00, service of process fees in the amount of $200.00, and investigation fees of $350.00 from defendant. (Lonstein Aff. ¶ 6).[9] The taxable costs for which a party may seek reimbursement include service of process fees and filing fees. See 28 U.S.C. § 1920; Fed. R. Civ. P. 54. Likewise, investigative fees are specifically authorized by the legislative history of Section 605, the governing federal statute in this case. See 130 Cong. Rec. § 14288 (daily ed. Oct. 4, 1984), *reprinted in* 1984 U.S.C.C.A.N. 4742, 4750 (stating that "[i]t is the intent of the committee that the power to direct the recovery of all costs under (3)(b)(iii) shall include reasonable investigative fees (related to the action brought) of an aggrieved party").

Although the Court may direct that investigative costs be awarded, it is not obliged to. See International Cablevision, Inc. v. Noel, 982 F. Supp. 904, 918 (W.D.N.Y. 1997) (stating that the "legislative history for § 605(e) instructs that the court has the power to direct the recovery of investigative fees, not that the court is required to order such an award"). The court in Noel suggested that the party requesting investigative costs must "supply contemporaneous time records to substantiate the fee request," as "a request for investigative fees pursuant to § 605(e)(3)(B)(iii) should be subject to the same level of scrutiny to which requests for attorneys' fees are subjected." Id. at 917-18.

---

[9]Plaintiff originally sought an award of prejudgment interest as well (Compl. at p.8(f)), but later withdrew this request. (Letter of Julie Cohen Lonstein, Esq., dated May 15, 2006).

Here, plaintiff has submitted an affidavit from the auditor who conducted the investigation. (Ex. D to Westrich Aff.). The affidavit describes the precise services performed and the amount of time spent in the establishment. (Id.) The invoice and fee for these services has been provided to the Court, with a description of the services performed. (Ex. E to Westrich Aff.). Plaintiff has also submitted an affidavit from the vice-president of plaintiff's company describing the process of selecting and instructing auditors, and the fee for their investigative services. (Westrich Aff. ¶¶ 4-5, 9).

The Court finds that this documentation is sufficient to warrant the awarding of investigative costs of $350.00. Based on the supporting affidavits, this Court finds the amount requested for service of process and filing fees to be reasonable and respectfully recommends that plaintiff be awarded $800.00 in costs from defendants.

## CONCLUSION

In summary, this Court respectfully recommends that plaintiff be awarded $11,000.00 in damages, plus attorneys' fees and costs in the amount of $2,187.50, for a total of $13,187.50. The Court respectfully recommends that plaintiff's request for injunctive relief be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health & Human

Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
      July 18, 2006

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York